IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| C.K., a minor child, by and through his mother and next friend, B.M., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:23-cv-01133-JDB-jay |
| WEST CARROLL SPECIAL SCHOOL DISTRICT BOARD OF EDUCATION, et al., | ) ) ) | |
| Defendants. | ) ) | |

<u>ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS</u>

Before the Court is the motion of Defendants, West Carroll Special School District Board of Education ("West Carroll"), Clayton Morris ("Coach"), and Preston Caldwell ("Superintendent"), for partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (Docket Entry ("D.E.") 27.) Plaintiff has submitted a response (D.E. 28) to which Defendants replied (D.E. 29). For the following reasons, Defendants' motion is granted in part and denied in part.

## BACKGROUND

On July 14, 2022, C.K., a minor student at West Carroll High School and a member of the West Carroll football team, travelled to Hopkinsville, Kentucky, with his team and their Head Coach, Morris, for a two-night, school-approved football camp.[1] (D.E. 1 at PageID 3.) That evening, players selected their roommates for the hotel stay. (*Id.* at PageID 3–4.) E.S. and D.L.,

---

[1] The following allegations are derived from the complaint and are taken as true for purposes of this Rule 12(c) motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (citing *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511–12 (6th Cir. 2001)).

two other minors on the team, indicated that they would room with C.K. and J.M, as each room could accommodate four people. (*Id.*) However, E.N., a teammate who had behavioral issues that included acting in an inappropriate sexual manner, asked Morris if he could join the four of them.[2] (*Id.*) The Coach reluctantly agreed after E.S. and D.L. voiced their approval. (*Id.* at PageID 4.) Morris cautioned, though, that E.N. could only stay in the room if he "acted right." (*Id.*)

Once at their lodgings, the Coach sent the students to their rooms without furnishing them with his contact information or that of any other chaperone. (*Id.*) After the five boys went to their room, E.N. proceeded to act erratically. (*Id.*) He removed his clothes, played loud music, jumped from bed to bed, and "used a water bottle to simulate ejaculating on C.K. and E.S." (*Id.*) Eventually, C.K. fell asleep despite the disruptive environs. (*Id.*) Thereafter, C.K. woke up to E.N. forcefully penetrating C.K.'s mouth with his penis while D.L. recorded the incident. (*Id.* at PageID 5.) Traumatized and shocked, C.K. defended himself by putting E.N. in a headlock before D.L. and J.M. separated them. (*Id.*) Then, D.L. asked C.K., "It's three against one, what are you going to do?" (*Id.*) Outnumbered and unable to contact a chaperone, C.K. returned to bed. (*Id.*)

The next day, D.L. exhibited the video to other members of the team. (*Id.*) One player notified Morris of the video and assault, so he contacted the school's principal, who told the Coach to contact the affected students' parents. (*Id.*) When he called B.M., C.K.'s mother, Morris assured her that C.K. and E.N. would not come into contact during the remainder of the trip, but that apparently did occur. (*Id.*) E.N. harassed C.K. about the assault and cautioned him not to tell people about it. (*Id.*) In fact, E.S. overheard E.N. say that he would "get C.K. for snitching" while

---

[2] The complaint alleged that "upon information and belief" E.N. had committed numerous sexually inappropriate acts while a student at West Carroll—both in middle and high school, including engaging in public sexual acts, forcing students to send him nude photographs, and displaying his penis in class. Despite these incidents, West Carroll did not punish him. (D.E. 1 at PageID 7.)

another member of the team threatened violence toward C.K. if Morris got fired because of the assault.  (*Id.*)  That night, B.M. arrived in Kentucky to check on her son.  (*Id.* at PageID 6.)  After learning more about the circumstances, she helped C.K. pursue criminal charges against E.N.  (*Id.*)

On July 19, B.M. and her spouse, D.M., met with the principal, athletic director, and Morris about the incident.  (*Id.*)  The principal assured B.M. that the students would be separated but indicated that no disciplinary action would be forthcoming for E.N. because the school's handbook did not have a policy on sexual assault.  (*Id.*)  Nevertheless, it was the principal's understanding at the time that E.N. would be voluntarily transferring to another school.  (*Id.* at PageID 6–7.)  At no point during this meeting did any of the school's representatives inform B.M that C.K. could file a Title IX complaint or suggest that the school might initiate an investigation.  (*Id.* at PageID 7.)

Once school resumed, E.N. in fact did not transfer schools and C.K. continued to be harassed about the assault.  (*Id.*)  School officials initially told B.M. that E.N. would receive a year-long suspension; however, she learned that Caldwell lowered the punishment to thirty days because he believed a year was too punitive.  (*Id.*)  As a result, B.M. publicly addressed this issue at the next school board meeting.  (*Id.*)  At that session on August 5, 2022, according to B.M., the Superintendent informed her that punishments were determined by the principal, disciplinary actions were not her concern, and she would not receive notice of any punishments.  (*Id.* at PageID 7–8.)  When B.M. indicated that E.N. shared a lunch period with C.K. and still had class with him, Caldwell responded, "There is nothing in the policy that covers this type of sexual assault, again B.M. what would you like me to do about it?"  (*Id.* at PageID 8.)  Thereafter, the victim's mother asked for steps to be taken to protect C.K., to which the Superintendent responded by threatening to call security.  (*Id.*)

On August 17, 2022, West Carroll provided B.M. with contact information for Crystal Polinski, its Title IX representative, who supplied her with a formal complaint form. (*Id.*) B.M. completed and filed the complaint the next day. (*Id.*) On August 19, B.M. met with Polinksi and another school representative where B.M. discussed the assault and expressed concern that C.K. was in an unsafe environment around his abuser. (*Id.*) Polinksi acknowledged that she had no prior knowledge of the assault despite it occurring more than a month ago. (*Id.*) Additionally, B.M. shared a photograph with Polinski that students were circulating around the school which depicted C.K. with an eggplant emoji on his mouth to indicate a penis. (*Id.*) She also told Polinski that C.K. was still enduring peers calling him sexually related names. (*Id.* at PageID 9.)

Shortly thereafter, Polinski issued her report. (*Id.*) In it, she made conclusory remarks that Plaintiff disputed:

> [T]hat 1) the students involved in the assault were immediately picked up and sent home [from the football trip], 2) that E.N. was completely separated from C.K. at school ([though] they still shared a lunch period and, for a period, shared a class), and 3) that the investigations were completed, and the students received disciplinary actions.

(*Id.*) Apparently, according to B.M., Polinksi never interviewed C.K., E.N, or any other student involved in the assault. (*Id.*) Polinski recommended that the school separate E.N. and C.K. "as best as [it could] without interrupting the education of either student or any other student." (*Id.*)

On September 19, B.M. voiced concern that Polinski had not investigated D.L. for videoing the assault. (*Id.* at PageID 10.) She construed this as an appeal of her report, and, as such, West Carroll appointed a local attorney, Anthony Minor, as an independent hearing officer. (*Id.*) On October 3, he released an Amended Written Decision accepting that the assault occurred and that D.L. recorded it. (*Id.*) However, Minor recommended maintaining communication with

prosecutors in Kentucky and awaiting release of the video and the final disposition of the criminal case before proceeding further.  (*Id.*)  During this time, West Carroll took no remedial action.  (*Id.*)

Finally, on October 6, D.L. allegedly confronted C.K. in a school bathroom and pretended to unbutton his pants while saying that he was going to give Plaintiff "flashbacks" to his assault. (*Id.*)  B.M. reported this incident to Defendants, who took no action.  (*Id.*)  After asking to speak to the school board about the Title IX complaint and investigation, B.M. did so on November 3. (*Id.* at PageID 10–11.)  Apparently only then did West Carroll investigate D.L.'s conduct in the bathroom.  (*Id.* at PageID 11.)  Ultimately, Polinski prepared a final report advising that "sexual harassment and bullying, and consequences of bullying, [should] be discussed with the perpetrators."  (*Id.*)  However, she suggested no disciplinary or protective measures.  (*Id.*)  Because of continued harassment and feeling that Defendants were not protecting him, C.K. transferred schools.  (*Id.* at PageID 12.)  C.K. apparently still plays sports against West Carroll where he competes with his alleged abusers.  (*Id.*)  According to the complaint, the abuse traumatized C.K., who has since engaged in self-harm for which he has been hospitalized.  (*Id.*)

## STANDARD OF REVIEW

The standard of review for a motion for judgment on the pleadings is the same as that for a motion to dismiss for failure to state a claim.  *See Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020) (citing *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014)).  Thus, the court accepts all well-pleaded allegations as true, asks whether there are any material factual issues, and, if not, may grant the movant's request if they are "clearly entitled to judgment."  *See JP Morgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581–82 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)).  The

court need not treat legal conclusions or unplausible assertions as true. *Id.* at 582 (quoting *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)).

## LAW & ANALYSIS

Of the seven counts alleged by Plaintiff (D.E. 1), Defendants move for judgment on the pleadings as to all except for Count I (D.E. 27). The counts subject to the motion are: Title IX retaliation against West Carroll ("Count II") (D.E. 1 at PageID 13–14); an equal protection violation against West Carroll and Caldwell ("Count III") (*Id.* at PageID 14–16); an equal protection and substantive due process violation against West Carroll, Morris, and Caldwell ("Count IV") (*Id.* at PageID 16–18); negligence and failure to train against West Carroll and Caldwell ("Count V") (*Id.* at PageID 18–19); negligence and failure to supervise against West Carroll and Morris ("Count VI") (*Id.* at PageID 19–21); and, lastly, First Amendment retaliation against West Carroll ("Count VII") (*Id.* at PageID 21).

I.  <u>Count II</u>

C.K. contends that West Carroll retaliated against him because his mother submitted a Title IX complaint on his behalf. (*Id.* at PageID 14.) Specifically, Plaintiff avers that West Carroll excluded him from participation in programs and denied him the benefits of education; refused him protection from his harassers and the abuser; required him to participate in an interview without the presence of a parent or guardian where the interviewer attempted to confuse his statement; and failed to adequately punish his harassers. (*Id.*) Because of these acts, he allegedly suffered, *inter alia*, emotional pain and suffering and moved to another school to evade his abusers. (*Id.*)

West Carroll's motion to dismiss is based on Plaintiff's failure to plead sufficient facts to establish the requisite correlation between the protected activity and the retaliation. (D.E. 27-1 at

PageID 123–24.)  Plaintiff responded that the suspicious timing of the school's failure to protect C.K. after B.M.'s Title IX report is sufficient for a Title IX claim.  (D.E. 28 at PageID 134–35.) West Carroll replied that the facts averred by Plaintiff are actually legal conclusions.  (D.E. 29 at PageID 157.)  According to Defendant, C.K. has not alleged who retaliated against him, provided facts to show that the cited examples of retaliatory actions were retaliation, or how B.M.'s Title IX claims led to acts of retaliation by unidentified individuals.  (*Id.*)

To establish Title IX retaliation, a plaintiff must show that "(1) he engaged in a protected activity, (2) [defendant] knew of the protected activity, (3) he suffered an adverse school-related action, and (4) a causal connection exist[ed] between the protected activity and the adverse action." *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 320 (6th Cir. 2017).  These elements may be established through direct or circumstantial evidence.  *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 756 (M.D. Tenn. 2019) (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010)).  Complaining of discrimination on the basis of sex is a protected activity.  *Id.* (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005)).  For an action to be "adverse," it "must be sufficiently severe to dissuade a 'reasonable person' from engaging in the protected activity." *Gordon*, 686 F. App'x at 320 (citing *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Litigants seeking to establish a causal connection between the protected activity and the alleged retaliation must "proffer evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." *Condiff v. Hart Cnty. Sch. Dist.*, 770 F. Supp. 2d 876, 883–84 (W.D. Ky. 2011) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

As a threshold matter, Plaintiff engaged in a protected activity by reporting sexual assault to West Carroll and, obviously, Defendant knew about the claims because they were made multiple

times to its representatives.  (D.E. 1 at PageID 5–12.)  The only questions remaining are whether C.K. suffered an adverse action and, if so, whether it resulted from B.M.'s Title IX complaint.  *See Gordon*, 686 F. App'x at 320.  The Court finds that Plaintiff has plausibly alleged both.

Ongoing harassment about a sexual assault, like that claimed here, may well be severe enough to "dissuade a reasonable person from engaging in a protected activity."  *Id.* (citing *White*, 548 U.S. at 68).  Plaintiff has insisted that it was so severe that it required him to transfer to another school much farther away from his home.  (D.E. 1 at PageID 12.)  Therefore, at this early stage, C.K. has adequately pleaded that he suffered an adverse school-related action by West Carroll failing to discipline his abusers, making light of his assault, and declining to protect him from ongoing harassment.

Likewise, Plaintiff has averred sufficient facts to infer a nexus between his protected activity and these hostile actions.  Although B.M. did not file a formal Title IX complaint until mid-August (*Id.* at PageID 8), C.K. and B.M. reported the assault immediately (*Id.* at PageID 5–6) and B.M. met with school officials in July about their next steps (*Id.* at PageID 6).  The victim's mother continued to communicate with school officials.  (*Id.* at PageID 5–11.)  She initially was informed that E.N. would receive a year-long suspension, but that proved untrue when Caldwell reduced the punishment, even after another alleged assault reported by C.K.'s mother.  (*Id.* at PageID 7, 10–11.)  Each of these hostile actions happened within months of the sexual assault and the report about it.  (*Id.* at PageID 5–12.)  Given this temporal proximity, Plaintiff has met his burden of averring circumstantial facts to establish a causal connection between his protected activity and the adverse school-related actions he endured.  *See Doe*, 367 F. Supp. 3d at 756; *Condiff*, 770 F. Supp. 2d at 883–84.  Consequently, C.K.'s Title IX retaliation claim against West Carroll may proceed.

II.   <u>Count III</u>

Plaintiff next asserts under 42 U.S.C. § 1983 that West Carroll and Caldwell violated his rights under the Equal Protection Clause of the Fourteenth Amendment.  (D.E. 1 at PageID 14–16.)  He alleges that they denied him protection and the on the basis of his education because of his sex by being deliberately indifferent to his discriminatory harassment.  (*Id.*)  To claim deliberate indifference for peer-to-peer harassment, a plaintiff must show: (1) that he was the subject of *discriminatory* peer harassment; and (2) that "school officials responded to the discriminatory peer harassment with deliberate indifference[.]"  *Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 852 (6th Cir. 2016) (citing *Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 357 (6th Cir. 2014)).  "The deliberate indifference standard . . . sets a high bar for plaintiffs to recover[.]"  *Id.* at 848 (citation omitted).  It necessitates only that "administrators respond to known peer harassment in a manner that is not 'clearly unreasonable in light of the known circumstances.'"  *Id.* (quoting *Davis*, 526 U.S. at 648).

Here, Plaintiff has failed to allege *discriminatory* peer harassment.  C.K was the subject of peer harassment in the form of an egregious assault and continued harassment (D.E. 1 at PageID 5–11), but that is not enough to sustain a deliberate indifference action.  *Stiles*, 819 F.3d at 852.  He must also show that the peer harassment was based on his sex; in other words, he must aver that E.N. assaulted him *because he is male*.  *Id.*  The complaint does not state such a claim.  Instead, it shows a history of indiscriminate sexual acts by E.N.  (D.E. 1 at PageID 7.)  For instance, without reference to the victims' sex, the complaint declares that "E.N. had previously engaged in public sexual acts in the school bleachers, forced other students to send him naked photos, . . . and took his penis out publicly in class, pretending it was a helicopter."  (*Id.*)  Further, the complaint notes that E.N. "forced a girl to engage in oral sex[.]"  (*Id.*)  Thus, it appears that E.N.'s sexual

misbehavior was not motivated simply by the victim's sex but something else.  (*Id.*)  Therefore, Plaintiff has not alleged that the peer harassment he suffered was discriminatory.  *See Stiles*, 819 F.3d at 852.  His deliberate indifference claim is dismissed.

## III.    Count IV

Next, C.K. contends that West Carroll, Caldwell, and Morris violated his substantive due process rights by creating danger that resulted in his assault.  (D.E. 1 at PageID 16–18.)  As a rule, the Due Process Clause only protects citizens from state action; it does not also demand that the government prevent harms by a third party.  *See M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 448 (6th Cir. 2021) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)).  However, there are two recognized exceptions to this rule.  *Id.*  The first occurs where the state has custody over an individual such that a "special relationship" exists between the government and the plaintiff.  *See Stiles*, 819 F.3d at 853 (citing *DeShaney*, 489 U.S. at 199–201).  The second is where the "state renders a person 'more vulnerable to' the dangers that befell him."  *M.J.*, 1 F.4th at 448 (quoting *DeShaney*, 489 U.S. at 201).  In other words, "when the state causes or greatly increases the risk of harm to its citizens through its own affirmative acts, it has established a 'special danger' and a duty to protect its citizens from that risk."  *Id.* (quoting *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006)).  The first exception is known as the "special relationship" doctrine, while the second is the "state-created danger" theory.  *See S.A. ex rel. W.A. v. Bd. of Educ. of Perry Cnty., Ky.*, --- F. Supp. 3d ---, No. 21-cv-149, 2023 WL 6051260, at *8 (E.D. Ky. 2023) (citing *Meyers v. Cincinnati Bd. of Educ.*, 343 F. Supp. 3d 714, 723–26 (S.D. Ohio 2018)).  Under either, liability is difficult to establish as the Due Process Clause is not a font of general tort law, and the Constitution does not provide a remedy for every wrong.  *See Doe v.*

*Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932–33 (6th Cir. 2020) [hereinafter *Doe II*] (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

From the outset, the special relationship doctrine is inapplicable here.  The Sixth Circuit has routinely commented that schools and teachers do not have a special relationship with their students because they lack the level of control seen in other custodial situations, such as when jailers have custody over an incarcerated person.  *See, e.g.*, *id.* at 932 ("After all, we have repeatedly held that students in schools are not in state 'custody[.]'"); *Stiles*, 819 F.3d at 854 ("Moreover, as the district court indicated, the Sixth Circuit has consistently rejected the existence of a special relationship between school officials and students based on compulsory attendance laws or the school's knowledge of a student's vulnerability."); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995).  As such, if Plaintiff's due process claim is viable, it must be based on the state-created danger theory.

To prove a state-created danger, a plaintiff must assert three elements: (1) a state actor must have taken an "affirmative act that either creates or increases the risk that the plaintiff will be exposed to private acts of violence;" (2) "this risk of private harm must rise to the level of a 'special danger' to a specific victim that exceeds the general risk of harm the public faces from the private actor;" and (3) "the official must act with a sufficiently culpable mental state."  *Doe II*, 954 F.3d at 932 (internal quotation marks and citations omitted).  As to the first element, an affirmative act does not include omissions.  *M.J.*, 1 F.4th at 449.  Thus, a school and its employees may not be liable, for instance, for failing to discipline a student or neglecting to take steps to prevent harm to a student by separating them from their peers.  *Stiles*, 819 F.3d at 855 ("Failing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to [authorities] are plainly omissions rather than affirmative acts.").  For the culpability element, a

plaintiff must aver that the state actor was deliberately indifferent to the risk of a private party's violence. *Doe II*, 954 F.3d at 933.  This rule itself has two parts:

> An official must be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.  Having drawn the inference, the official next must act or fail to act in a manner demonstrating reckless or callous indifference toward the individual's rights.

*Id.* (internal quotation marks and citations omitted).  Furthermore, the official must be cognizant of the "specific risk that later develops" and not a general risk of harm by a private actor.  *Id.* at 934.  Finally, the official's response must shock the conscience.  *Id.*  And, where an official selects a response based on a legitimate government interest, that response typically will not surpass that bar.  *Id.*

### a.  West Carroll

Plaintiff alleges that West Carroll violated his due process rights by neither investigating C.K's assault nor "remediat[ing]" it.  (D.E. 1 at PageID 18.)  Although Defendant raises *Monell* as a defense (D.E. 27-1 at PageID 121–23), the Court need not reach that issue because West Carroll did not perform an affirmative act.  The complaint speaks only of West Carroll's failings not its actions; it is precisely the lack of action with which Plaintiff quarrels.  (D.E. 1 at PageID 16–18.)  Such a claim is not cognizable, *M.J.*, 1 F.4th at 449, so this count against West Carroll is dismissed.

### b.  Caldwell

C.K. next maintains that Caldwell created a danger by reducing E.N.'s suspension and neglecting to punish Plaintiff's other harassers and, thereby, prevent further harm to him.  (D.E. 1 at PageID 17.)  Again, none of these purported wrongs amounted to an affirmative act.  Failure to discipline and reducing discipline are omissions.  *Stiles*, 819 F.3d at 854–55.  Likewise, even if reducing E.N.'s suspension constituted an affirmative act, C.K.'s only injury was seeing E.N. at

school.  (D.E. 1 at PageID 7–8.)  Although thirty days may well have been a lenient discipline and not that chosen by B.M., C.K., or even this Court, it does not shock the conscience to choose that punishment as opposed to a year.  *See, e.g.*, *Meyers*, 343 F. Supp. 3d at 725–26 ("Actions that shock the conscience are generally so brutal and offensive that they do not comport with traditional ideas of fair-play and decency.")  At base, C.K. did not have a constitution right never to see E.N. again at a *public* school.  *Cf. Davis*, 526 U.S. at 648 (highlighting that students who are the victims of harassment do not have the right to demand that a school levy a particular punishment—such as expulsion—against their abuser).

       *c.  Morris*

       C.K. finally alleges that Morris placed him at a special danger by assigning E.N. to room with him and three others in a four-person hotel room despite knowledge of E.N.'s prior behavioral issues.  (D.E. 1 at PageID 17.)  Assuming *arguendo* that Morris's acquiescence to E.N.'s request to room with C.K. and the others was an affirmative act, this claim must still fail.  The complaint— upon information and belief—contends that Morris was aware of E.N.'s prior sexual bad acts at school.  (*Id.* at PageID 4.)  And the complaint bolsters this assertion by recalling that Morris conditioned E.N.'s tenancy on him "act[ing] right."  (*Id.*)  Yet, when measured against the steep burden of deliberate indifference to the specific harm suffered—sexual assault on a male peer— Morris's knowledge was insufficient.  *See Doe II*, 954 F.3d at 934.  Defendant did not have enough notice of that specific harm to render his failure to separate E.N. from other students, particularly C.K., while on the trip conscience shocking.  *See id.* at 933–34.  As such, Plaintiff cannot maintain an action against Morris for creating a danger.

IV.    <u>Count V</u>

C.K. next asserts that West Carroll and Caldwell negligently failed to train their employees about the procedures for chaperoning students on school-sponsored trips and how to address complaints of sexual assault and harassment. (D.E. 1 at PageID 18–19.) Plaintiff concedes, however, that it cannot bring such an allegation against West Carroll under the Tennessee Government Tort Liability Act, which does not waive sovereign immunity for this claim. (D.E. 28 at PageID 140.)

Failure to train in Tennessee is a direct action against an employer for not training subordinates despite a duty to do so to ensure the safety of innocent persons who are subsequently harmed by the negligent acts of the untrained employees. *See Binns v. Trader Joe's East, Inc.*, --- S.W.3d ---, No. M2022-01033-SC-R11-CV, 2024 WL 1503703, at *10 (Tenn. 2024). It is not an action premised on vicarious liability of an employer for the tortious acts of its employee. *Id.* at *6. To make out this claim, a plaintiff must aver every element of negligence—duty, breach, causation, and damages—and, specifically, that the individual had the duty to train his agents and by failing to do so, those agents negligently harmed the plaintiff. *Id.* at *10 (citation omitted); *Parker v. Holiday Hosp. Franchising, Inc.*, 446 S.W.3d 341, 350 n.7 (Tenn. 2014) (quoting *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008)). The touchstone of this claim, though, is that the harm suffered by the claimant must have been of the general type reasonably foreseeable to the party accused of failing to train his subordinates. *See, e.g.*, *Gunter v. Estate of Armstrong*, 600 S.W.3d 916, 929 (Tenn. Ct. App. 2019). As Tennessee's courts have cautioned, a defendant may not be liable where the harm suffered was unforeseeable. *See Roberts v. Robertson Cnty. Bd. of Educ.*, 692 S.W.2d 863, 871 (Tenn. Ct. App. 1985) (citing *Ray Carter, Inc. v. Edwards*, 436 S.W.2d 864, 867 (Tenn. 1969)).

Here, assuming without deciding that Caldwell is a proper defendant despite not being an employer, Plaintiff's claim may nevertheless not proceed. It appears that C.K. raises two separate incidences of failure to train as to Caldwell: (1) that he did not instruct Morris and others about how to identify, report, and protect students from sexual assault while on school-sponsored field trips; and (2) that he neglected "to train, or inform [his] staff members, of the possibility of continued harassment by C.K.'s assaulter and harassers and failed to train [his] staff on how to respond to complaints of sexual assault and harassment." (D.E. 1 at PageID 18–19.)

As to the first, C.K. simply has not pleaded that the general type of harm suffered—same-sex peer sexual assault on a school-sponsored athletics trip—was foreseeable *to Caldwell* when he failed to train Morris and the other chaperones. On this score, the complaint states that "[p]rior to C.K.'s assault West Carroll was aware of complaints regarding E.N.'s sexual behavioral issues. History of this behavior should have placed *West Carroll* and *Morris* on notice of the risk to C.K.'s risk prior to his assault." (D.E. 1 at PageID 18.) The plain language of the complaint, then, does not maintain that Caldwell knew anything about E.N.'s behavioral issues prior to the assault, so he could not have foreseen the harm C.K. later unfortunately suffered. (*Id.*)

Regarding the second, Plaintiff has not articulated enough facts from which it would be reasonable to infer that Caldwell knew or should have known that C.K. would face ongoing harassment and bullying. The general type of harm that C.K. allegedly suffered after the assault was ongoing bullying in the form of unidentified students calling him names referencing the assault and the October incident in the bathroom with D.L. (*Id.* at PageID 7–11.) As to the general bullying and name calling (*Id.* at PageID 9), it is not evident what training or action Caldwell should have provided to staff and, more importantly, there is no allegation that Caldwell should have foreseen that harassment. The only averment that might support a finding of foreseeability

15

is that B.M. confronted Caldwell at a school board meeting in August and asked what measures West Carroll was taking to protect her son and that Caldwell said that no policy existed on that issue. (*Id.* at PageID 7–8.) However, B.M.'s speculative statements about her concern that her son might not be safe would not place a reasonable person on notice that B.M.'s fear was that other students would call her son names and share photographs of him with emojis on his face. (*Id.* at PageID 9.) Similarly, this encounter at the August school board meeting would not have made a reasonable person in Caldwell's position foresee that one of the participants in C.K.'s assault would bully him in a school bathroom and say he was going to make Plaintiff have "flash backs" to the assault. (*Id.* at PageID 10.)

The complaint also does not note how any training Caldwell could have provided would have prevented this harm to C.K., unless such training included directing teachers and staff to monitor every activity of Plaintiff and D.L. to the extent of knowing when and where they went to the bathroom on any given day at school, or perhaps escorting them to the restroom. Such a duty would be neither reasonable nor feasible. *See Mason ex rel. Mason v. Metro. Gov't of Nashville & Davidson Cnty.*, 189 S.W.3d 217, 224 (Tenn. Ct. App. 2005) (acknowledging that Tennessee law does not require teachers to foresee and protect against every conceivable student act every day). Therefore, Plaintiff may not sustain a failure to train action against Caldwell given the lack of reasonable foreseeability of the general types of harms suffered by C.K. and because the dearth of training was not the cause of Plaintiff's injuries. Count V, consequently, is dismissed.

V.    <u>Count VI</u>

C.K. next contends that West Carroll and Morris negligently failed to supervise the students on the Kentucky football trip. (D.E. 1 at PageID 19–21.) As in Count V, West Carroll raises the defense of sovereign immunity, to which Plaintiff does not object. (D.E. 27-1 at PageID 124–25;

D.E. 28 at PageID 140.)  Thus, the undersigned will only evaluate the motion as it relates to Morris. As an initial observation, few allegations in Count VI are directed at Morris and the Court will only scrutinize those.  (D.E. 1 at PageID 19–21.)  Specifically, Plaintiff makes no claim that Morris did anything after the assault which harmed him.  (*Id.*)  The only potential liability, then, would be based on Morris's failings on the trip in July.  (*Id.*)

Like failure to train, failure to supervise is a direct action, not one founded on vicarious liability.  *Binns*, 2024 WL 1503703, at *6.  To allege a prima facie case, a plaintiff must assert that the defendant employer breached a duty owed to plaintiff that actually and proximately caused the claimant injury and that "the employer had knowledge of the employee's unfitness for the job." *Doe v. Cath. Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008) (citing *Phipps v. Walker*, No. 03A01-9508-CV-00294, 1996 WL 155258, at *3 (Tenn. Ct. App. Apr. 4, 1996)); *see Parker*, 446 S.W.3d at 350 n.7 (quoting *Satterfield*, 266 S.W.3d at 355).  In student-teacher situations, the duty imposed is heightened based on the element of control and the youth of the pupil.  *See Roberts*, 692 S.W.2d at 870.  Nevertheless, as in failure to train claims, the omission of supervision must produce the general kind of harm reasonably foreseeable from the want of supervision; otherwise, the omission is not redressable.  *Id.* at 871.

Here, Plaintiff's claim against Morris is deficient.  First, while the Coach assuredly owed C.K. a duty of supervision, there is no plausible contention that he ever breached that obligation. Presumably, E.N. had to be assigned to lodge with some teammates, regardless of his prior incidences of sexual misbehavior.  There is no allegation that E.N. was openly predisposed to attack C.K. as opposed to any other teammate.  As such, Morris's decision to allow E.N. to room with C.K., of itself, was not a breach of the applicable standard of care.

Second, Morris's acquiescence to having five boys in a four-person room does not constitute tortious behavior.  Under the circumstances, sexual assault by one occupant of a hotel room while the other occupants record the incident was not a foreseeable harm from allowing the students to exceed the capacity of their accommodations.  Noisiness and cramped quarters may have been likely—even, perhaps, frustration with the overcrowding by one or more of the tenants may have been forecasted—but sexual assault was not a foreseeable consequence of that action.  Such an allegation is not plausible even if, in hindsight, that is what tragically occurred.  *Id.* (noting that the general kind of harm suffered must have been foreseeable).

Third, Morris's neglect to provide C.K. with the Coach's room and telephone number—or that of other chaperones—was not a cause of Plaintiff's harm.  (D.E. 1 at PageID 19.)  There is no allegation that C.K. attempted to or would have reached out to Morris about E.N.'s behavior before going to sleep.  The closest factual statement recalls, "C.K. and his roommates were unable to communicate with any supervising adults about their concerns for safety or issues with E.N.  The students were for all intents and purposes left on their own."  (*Id.* at PageID 4.)  That does not mean that C.K. or anyone else in his room would have actually tried to reach out to Morris and what the consequence of that communication may have been.  It only states that the students did not have the option of contacting a chaperone.  (*Id.*)  The lack of an option to communicate with an adult was not the cause of C.K.'s later sexual assault.  Likewise, sexual assault was not a foreseeable general type of harm that would result from Morris not providing contact information for himself or a chaperone.  *See Roberts*, 692 S.W.2d at 871 (requiring that the harm suffered be of the general type that would foreseeably result from the failure to supervise).  It is possible that it would be foreseeable under such circumstances that students could quarrel or someone could have become sick and been unable to reach a chaperone.  Those are harms within the realm of

foreseeability under these circumstances.  That C.K. would be awakened to a sexual assault by E.N. while another roommate videoed it because of Morris's failure to provide contact information was not reasonably foreseeable.  *See Mason*, 189 S.W.3d at 226–27 (applying the foreseeability standard in a school setting and identifying the general types of harms that should be foreseen). Therefore, Plaintiff's failure to supervise claim is dismissed.

VI.    Count VII

Finally, C.K. asserts that West Carroll violated his First Amendment rights by retaliating against him for reporting sexual assault.  (D.E. 1 at PageID 21.)  The standard for First Amendment retaliation is substantially akin to that of Title IX, which was analyzed in Court II above.  *Cf. Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010) (quoting *Siggers-El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005)).  For the reasons accepted for his Title IX allegation, the Court again finds that Plaintiff has alleged retaliation for a protected activity.  However, the difference between Title IX and 42 U.S.C. § 1983, through which C.K. brings his First Amendment retaliation claim, is that a plaintiff may only sue and recover from a local government entity—including a local education agency—if he was injured by a policy or custom of the school system.  *See Hill v. Blount Cnty. Bd. of Educ.*, 203 F. Supp. 3d 871, 885 (E.D. Tenn. 2016).  This means that school districts, unlike employers in most state statutory or common law tort cases, may not be held liable for the tortious acts of their agents.  *Id.*  That prohibition does not extend, however, to individuals functioning as final policymakers for the school system when taking the purportedly unlawful action.  *See Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  Furthermore, the failure to have a policy may serve as the basis of municipal liability under certain limited circumstances.  *See Mills v. Owsley Cnty.*, 483 F. Supp. 3d 435, 474–75 (E.D. Ky. 2020).  As the Eastern District of Kentucky recently articulated:

19

> The absence of a governing policy can be actionable where the need to act is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [school district] can reasonably be said to have been deliberately indifferent to the need in failing to institute a policy controlling the situation. A plaintiff can show either that the municipality possessed actual knowledge indicating a deficiency with the existing policy (or lack thereof), such as where there have been recurring constitutional violations, or that the need for a policy was plainly obvious. The latter case arises only in a narrow range of circumstances where a violation of federal rights may be a highly predictable consequence of the [school district's] failure to act.

*Id.* (internal quotation marks and citations omitted) (citing *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648–49 (6th Cir. 2012)).

Here, the only issue is whether C.K. endured retaliation from West Carroll because of a policy or custom of the school district or through the action of its final policymaker on disciplinary issues. On this score, Plaintiff implies that Defendant is liable because it had no policies whatsoever to cover sexual assault by one student against another. (D.E. 1.) Declining to have a policy to protect students, C.K. suggests, is a policy of apathy toward student-on-student sexual assault. (D.E. 28 at PageID 140–42.) But, as noted, Plaintiff can only maintain that argument if the need for a policy of non-retaliation for complaints of student sexual harassment was "plainly obvious," and that retaliation following a report of peer-on-peer sexual assault was "a highly predictable consequence of [West Carroll's] failure to [implement such a policy]." *Mills*, 483 F. Supp. 3d at 474–75.

C.K. has not alleged sufficient facts to satisfy this burden. The complaint mentions previous incidences of sexual assault and like acts by E.N. of which school officials were aware. (D.E. 1 at PageID 7.) If the question was whether the need for a policy relating to punishment and prevention of sexual assault by one student against another was plainly obvious, the answer may well be in the affirmative. But that is not at issue here. The question is whether the need for a policy to prevent *retaliation* for protected First Amendment complaints of certain conduct was

20

plainly obvious.  That is not evident from the complaint.  Indeed, nowhere does Plaintiff suggest that prior reports of sexual assault—by E.N. or anyone else—resulted in retaliation by West Carroll.  (*Id.*)  As a result, it would not be "plainly obvious" to school officials, or a reasonable person, that Defendant needed such a policy.  *Mills*, 483 F. Supp. 3d at 474–75.  Thus, the lack of a policy related to retaliation for reporting sexual assault by a student is not enough to overcome *Monell*.  *Id.*  The allegation against West Carroll, therefore, must be dismissed.

For a different reason, the First Amendment retaliation claim against Caldwell may not proceed.  Nowhere in the complaint does Plaintiff aver what exactly Caldwell did to retaliate against him for complaining about the sexual assault.  Perhaps C.K. could claim that Caldwell retaliated by reducing E.N.'s suspension; the problem with that theory, however, is that Plaintiff never states when Caldwell learned of B.M. or C.K.'s complaints.  (D.E. 1 at PageID 7.)  Thus, there is nothing saying that Caldwell knew about the protected activity prior to reducing E.N.'s punishment.  (*Id.*)  Similarly, the complaint does not show that Caldwell had any involvement in the interview in which a school representative made light of C.K.'s trauma (*Id.* at PageID 14), or that Caldwell knew about or could have prevented D.L.'s encounter with C.K. in the bathroom (*Id.* at 10).  It is not adequate to merely assume that Caldwell was personally involved in these actions, Plaintiff must plead plausible, non-conclusory facts that establish Caldwell's liability separate and apart from that of West Carroll; C.K. has not done so.  In sum, there are not enough factual allegations to show that Caldwell personally knew of Plaintiff's protected speech at the time he reduced E.N.'s suspension, and, likewise, Caldwell was not involved in the other alleged adverse school-related actions.  *Cf. King v. Zamiara*, 680 F.3d 686, 694 (6th Cir. 2012) (citation omitted) (acknowledging that the retaliatory action must be motivated by the protected activity, and, thereby, recognizing that the state actor must know about the protected activity to use it as

motivation for retaliation).  The First Amendment retaliation action against Caldwell, thus, must be dismissed.

## PROSPECTIVE INJUNCTIVE RELIEF

Defendant also moves to dismiss Plaintiff's request for injunctive relief because there is no likelihood that C.K. will endure future harm from West Carroll following his transfer from the school district.  (D.E. 27-1 at PageID 125.)  Plaintiff responds that it is too early to dismiss this request for relief because he is still forced to participate in sports on the same field as his abuser and harassers when playing against West Carroll.  (D.E. 28 at PageID 147.)  C.K.'s position is incorrect because the specific injunctive relief he seeks is unrelated to his ongoing potential threat of interacting with E.N., D.L., or others.  Plaintiff requests the following injunctive relief:

> Injunctive relief requiring Defendants to 1) provide regular and adequate anti-bullying, sexual assault, and anti-harassment training and education programs for school administrators, teachers, and students; 2) implement policies and procedures to prevent peer sexual assault, harassment, and bullying of all students; and 3) have permanently assigned staff members to monitor and address sexual assault, bullying, and harassment incidents and maintain statistical data on complaints and investigations of bullying incidents occurring in the West Carroll Special School District.

(D.E. 1 at PageID 22.)  To procure prospective injunctive relief, a civil rights plaintiff must allege that there is a sufficient likelihood that *he* will suffer a *similar injury* in the future because of the defendants' actions.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).  Here, C.K. seeks an injunction wholly unrelated to his future possible interactions with his abuser and bullies.  (D.E. 1 at PageID 22.)  Instead, Plaintiff's request is framed more toward changing West Carroll's general policies and procedures as it relates to other future students, not himself.  (*Id.*)  Notably, nowhere in the complaint (D.E. 1) or briefing for the instant motion (D.E. 28) did C.K. claim standing to pursue relief for other students who remain in the West Carroll Special School District nor did he demonstrate how or why he would have such standing.  *See Digit. Media Sols., LLC v.*

*S. Univ. of Ohio, LLC*, 59 F.4th 772, 782 (6th Cir. 2023) (describing the requirements to assert third-party standing).  Thus, absent a direct interest in the relief, a showing of a likelihood of future harm, or standing to pursue general relief on behalf of other persons, Plaintiff may not pursue injunctive relief.  *See id.*; *Lyons*, 461 U.S. at 111.  As such, C.K.'s request for injunctive relief is dismissed.

## CONCLUSION

Accordingly, for the reasons stated here, Defendants' motion is GRANTED IN PART and DENIED IN PART.  Specifically, Counts I and II may PROCEED while Counts III through VII are DISMISSED.  Plaintiff's request for injunctive relief is also DISMISSED.  Finally, all claims against Caldwell and Morris are DISMISSED.

IT IS SO ORDERED this 13th day of June 2024.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE